**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Robert E. Blackburn, Judge**

Civil Case No. 00-RB-1864 (BNB) (consolidated with Civil Action Nos. 00-RB-1908, 00-RB-1910, 00-RB-1919, 00-RB-1945, 00-RB-1954, 00-RB-1957, 00-RB-1963, 00-RB-1996, 00-RB-2040, 00-RB-2074, 00-RB-2149, 00-RB-2243, and 00-RB-2316)

IN RE ICG COMMUNICATIONS, INC. SECURITIES LITIGATION

---

## ORDER CONCERNING DEFENDANTS' MOTION TO DISMISS

---

**Blackburn, J.**

The matter before me is **Defendants' Motion to Dismiss Plaintiffs' Second Consolidated and Amended Complaint** [#160], filed August 1, 2005.  On August 25, 2004, I entered an order [#98] resolving the defendants' motion to dismiss the plaintiffs' consolidated amended complaint [#65], filed May 14, 2002.  I granted the motion in part, and denied it in part.  On July 18, 2005, the plaintiffs were granted permission to file their Second Consolidated Amended Complaint [#155].  The current motion to dismiss addresses the claims asserted in the Second Consolidated Amended Complaint, to which I will refer as the Complaint.  Defendants move to dismiss this proposed class action federal securities fraud case for failure to state a claim on which relief can be granted.

### I. JURISDICTION

I have jurisdiction over this case under **15 U.S.C. § 78aa** (actions to enforce the federal securities laws) and **28 U.S.C. § 1331** (federal question).

## II. STANDARD OF REVIEW

When ruling on a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), I must determine whether the allegations set forth in the complaint, if true, are sufficient to state a claim within the meaning of Fed.R.Civ.P. 8(a).  I must accept all well-pleaded allegations of the complaint as true.  *McDonald v. Kinder-Morgan, Inc.*, 287 F.3d 992, 997 (10th Cir. 2002).  "However, conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Fernandez-Montes v. Allied Pilots Association*, 987 F.2d 278, 284 (5th Cir. 1993); *see also Ruiz v. McDonnell*, 299 F.3d 1173, 1181 (10th Cir. 2002) ("All well-pleaded facts, as distinguished from conclusory allegations, must be taken as true."), *cert. denied*, 538 U.S. 999 (2003).  Thus, Rule 12(b)(6) requires dismissal if, taking all well-pleaded facts as true and construing them in the light most favorable to plaintiff, it is clear that he can prove no set of facts entitling him to relief.  *See Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Rocky Mountain Helicopters, Inc., v. Bell Helicopter Textron, Inc.*, 24 F.3d 125, 128 (10th Cir. 1994).

The plaintiffs allege a claim for securities fraud under § 10(b) of the Exchange Act, 15 U.S.C. § 78(b), and Rule 10b-5, 17 C.F.R. §240.10b-5, and a claim for controlling person liability under § 20(a) of the Exchange Act,15 U.S.C. § 78t(a).  The specialized pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub.L. No. 104-67, 109 Stat. 743 (codified at 15 U.S.C.  §§ 77z-1, 77z-2, 78u-4, 78u-5, 77t, 78o, 78t & 78u) are applicable to the plaintiffs' claims.  The defendants argue that the plaintiffs' allegations do not satisfy the requirements of the PSLRA.

The Tenth Circuit has concluded that the PSLRA has not "completely eviscerated our traditional Rule 12(b)(6) standard." *Pirraglia v. Novell, Inc.*, 339 F.3d 1182, 1188 (10th Cir. 2003); *see also In re Rhythms Securities Litigation*, 300 F.Supp.2d 1081, 1084 n.1 (D. Colo. 2004).  The court's role remains to determine whether the allegations set forth in the complaint, if true, are sufficient to state a claim. The complaint still must be construed in the light most favorable to the plaintiff, and its allegations must be taken as true.  *See Robinson v. City and County of Denver* 39 F. Supp. 2d 1257, 1262-1263 (D. Colo. 1999) (citing *Daigle v. Shell Oil Co.*, 972 F.2d 1527, 1533 (10th Cir.1992)).

However, because the PSLRA requires a plaintiff to plead facts giving rise to a "strong inference" of scienter, as well as to specify each statement alleged to be misleading and why it is misleading, the "'customary latitude granted the plaintiff under Rule 12(b)(6)" is modified as to these elements.  *Pirraglia*, 339 F.3d at 1187 (quoting *Gompper v. VISX, Inc.*, 298 F.3d 893, 896 (9th Cir. 2002)).  Thus, to determine whether the complaint supports a "strong inference" of scienter, the court must consider all reasonable inferences, including those unfavorable to the plaintiff.  *Id*. at 1188. Similarly, with respect to the requirement to specify the allegedly misleading statements underlying the plaintiff's claims, the court may not draw inferences in the plaintiff's favor if to do so would allow the plaintiff to make allegations without the required factual underpinnings.  *Id.*

### III.  PROCEDURAL BACKGROUND

This lawsuit arises from the plaintiffs' allegations of securities fraud concerning the publically traded stock of ICG Communications, Inc. ("ICG").  The facts outlined

below are taken from the plaintiffs' Complaint.  I will refer to specific portions of the

Complaint by paragraph (¶ 1).

Two defendants are named in the Complaint.  J. Shelby Bryan served as ICG's

President from May, 1995, until June 10, 1999; as Chief Executive Officer from May,

1995, until August 22, 2000; and as Chairman of ICG's Board of Directors from June,

1999, until August 22, 2000.  William S. Beans, Jr., joined ICG in July, 1999, as

Executive Vice President of Network Services, and served as ICG's President and

Chief Operating Officer from January 1, 2000, until December 4, 2000.  ICG filed

bankruptcy on November 14, 2000, and a Chapter 11 plan of reorganization was

approved by the Bankruptcy Court on October 10, 2002.  The plaintiffs have not named

ICG as a defendant in this case because its liabilities related to the plaintiffs' claims

were discharged in ICG's bankruptcy.  ¶ 31.

ICG was a telecommunications company.  In the late 1990s, ICG decided to

transform itself from a traditional provider of telecommunication lines for the

transmission of voice data to an internet network services provider.  ¶¶ 1, 38.

Providing internet network services requires high speed, high capacity data

transmission lines.  ICG built its system of high speed networks at a rapid pace

between 1996 and 1999.  During this time the company's long-term debt grew from

$400 million in 1995 to almost $2 billion by the end of 1999.  By the time Beans joined

ICG in July, 1999, ICG had planned to build a national data network.  Execution of this

plan would require the company to obtain significant financing.  To obtain this financing

Bryan and Beans knew that ICG would have to demonstrate to Wall Street and the

investing community that ICG's business model, centered around large scale sales of

internet data transmission lines, was working. ¶ 46.  Wall Street measured ICG's business success by "line count," the number of revenue producing lines ICG had installed, and the revenues those lines produced as reported by ICG. *Complaint*, ¶ 39. A provider of internet data-transmission lines conceivably could report large growth in line count because data transmission lines for the internet often were ordered and installed by the tens or hundreds of thousands. *Id.*

According to the plaintiffs, Bryan and Beans made material and misleading statements, and failed to reveal material facts, concerning the state of ICG's business during the third quarter of 1999, and the first and second quarters of 2000.  The alleged misrepresentations and concealment concerned three areas of ICG's business: 1) artificial inflation of line counts; 2) artificial inflation of reciprocal compensation revenue; and 3) non-disclosure of serious and continuing problems with ICG's communications network and customer service.  The plaintiffs define the proposed plaintiff class as including all persons who purchased ICG common stock on the open market between December 9, 1999, and September 18, 2000.  ¶ 181.

In their previous complaint, the Consolidated Amended Complaint [#65], filed February 15, 2002, the plaintiffs made similar allegations of securities fraud concerning these same three areas.  On August 25, 2004, I entered an order granting the defendants' motion to dismiss certain claims asserted in the plaintiffs' Consolidated Amended Complaint (August 25, 2004, order).  I briefly summarize below the claims that were dismissed in my August 25, 2004, order and the claims that survived the previous motion to dismiss.

**Line Count** - The plaintiffs' claims against Bryan related to the reporting of artificially inflated line counts were dismissed because the allegations in the Consolidated Amended Complaint did not indicate that Bryan took any action in response to the information revealed in ICG's line counts, that Bryan knew the line count numbers released in December, 1999, were false, or that Bryan was aware of other information indicating that ICG's reported line counts were false.  *August 25, 2004, order*, pp. 17-18.  The plaintiffs' claims against Beans concerning inflated line counts reported in March and June 2000, were dismissed because the plaintiffs did not allege that Beans' orders to create fictitious lines were carried out by ICG employees. *August 25, 2004, order*, p. 17, n.6.  The motion to dismiss was denied as to the plaintiffs' claims against Beans concerning inflated line counts in the fourth quarter of 1999.

**Reciprocal Compensation** - The motion to dismiss was denied as to the plaintiffs' claims against Bryan and Beans concerning the reporting of reciprocal compensation revenue in the fourth quarter of 1999.

**Network and Customer Service Problems** - The defendants' motion to dismiss was granted as to the claims against both Bryan and Beans concerning the alleged failures to disclose customer complaints and network problems.  These claims were dismissed because there was no "competent, non-conclusory allegation to support an inference that either Bryan or Beans knew of any such problems or complaints." *August 25, 2004, order*, p. 20.

The plaintiffs say they have provided significant additional factual details in the present Complaint, and argue that their allegations are sufficient to state claims on

which relief can be granted in each of the three areas summarized above.  The

defendants argue that all of the plaintiffs' allegations still are insufficient to state claims

for securities fraud against the defendants.

## IV.  FACTS

I will summarize below the plaintiffs' factual allegations which support their

claims that Bryan and Beans made material misrepresentations of fact, and concealed

material facts concerning three areas of ICG's business.  Additional allegations are

discussed in the analysis section of this order, Section V, below.

## A.  Line Count

Shortly after joining ICG, Beans began to conduct weekly meetings to monitor

ICG's progress in meeting Wall Street's expectations.  ¶ 49.  In addition, Bryan

convened larger monthly meetings that lasted two hours or more, with at least the first

45 minutes devoted exclusively to ICG's line count.  ¶ 50.  Beans led these monthly

meetings.  *Id*.  Bryan actively participated in the decision making process discussed at

these meetings and signed off on all line count reporting practices.  *Id*.  The plaintiffs

describe in the Complaint why they allege that line count was of particular importance

at ICG during this time:

> (B)y the fourth quarter of 1999, the technical problems with ICG's network
> threatened the lines that were already sold to the ISPs [internet service
> providers] and threatened ICG's ability to legitimately meet Wall street's
> expectations.  As a result, these weekly executive meetings became
> focused almost exclusively on ways for the Company to artificially inflate
> its line count to meet or exceed Wall Street's line count expectations.

¶ 85.

The plaintiffs allege that ICG publically represented that it recognized revenue

only on lines that were installed and revenue producing.  ¶¶ 88-89.  ICG's official line

count was tabulated using ICG's DTOTS database.  ¶ 96.  By company policy this database was to include only lines that were installed and producing revenue.  *Id.* Contrary to this policy, Bryan and Beans allegedly directed ICG employees to factitiously boost the lines tabulated in the DTOTS database, and, thus, the lines reported to be revenue producing, in several ways.  At the direction of Bryan and Beans, ICG allegedly reported non-billable lines, cancelled lines, internal lines, uninstalled lines, "in" lines, "free" lines, and even non-existent lines as revenue producing lines.  ¶¶ 96-99.

**Non-billable lines** were lines on which ICG would offer delayed billing or bargain rates to large customers if the customers would agree to take lines they did not need.

¶ 104.  Bryan and Beans instructed Vince Dibiase, Senior Vice President of National Sales, to execute this plan.  ¶ 104.  Dibiase says ICG sold 6,000 to 10,000 lines each to NetZero and UUNet in the fourth quarter of 1999, knowing that installation would not be complete in that quarter, and that both companies would reject a substantial number of those lines prior to installation.  *Id.*  Delayed billing agreements were used also at the end of 1999 to sell lines in the fourth quarter, when the parties to the sale knew that the lines would be cancelled in the next quarter, and the customer would be credited. ¶ 106.  Bryan was aware of this practice.  *Id.*

In addition, ICG counted lines that the plaintiffs call ISP free lines. ¶ 128. According to the plaintiffs, ICG agreed to provide ISPs with one free line for every line the ISP purchased from ICG.  *Id.*  The second line was intended to ensure that ISP customers would not experience difficulties or delays when trying to call to the ISPs

server via ICG's network.  *Id.*  Throughout the class period, ICG reported these free lines as revenue producing lines, causing ICG's line count to be inflated by as much as 25 percent.  *Id.*

**Cancelled lines** also affected ICG's line count for the fourth quarter of 1999.  At the end of that quarter, UUNet and Net Zero informed ICG that they had decided to cancel a significant portion of their order, requiring the removal of 6,000 to 10,000 lines from the official line count for that quarter.  ¶ 107.  Dibiase met with Beans and Bryan concerning the removal of these lines from the line count.  Beans instructed Dibiase to "play dumb" and not to remove the lines from the line count until the first quarter of 2000.  Beans told Dibiase that he wanted to wait to remove these lines from the line count so ICG's ability to meet Wall Street's expectations would not be affected.  ¶ 108. Another ICG employee reported that ICG's year end 1999 line count was inflated by 30,000 to 50,000 lines largely because senior management directed staff not to disconnect cancelled lines until the following quarter.  ¶ 109.

ICG also double-booked revenue from certain customers.  ICG recognized revenue attributable to customers that it had switched over to the NETCOM network that ICG purchased in 1998, yet ICG continued to book monthly revenue from the same customers as if they still were using ICG's original frame relay network. ¶ 111.  In May, 2000, ICG's Vice President of Finance, Richard Fish, discussed this practice with Beans, and Beans allegedly reported that Bryan had directed that the practice continue because it was necessary to meet Wall Street's expectations.  ¶ 112.

**Internal lines** were lines installed at ICG's NETCOM subsidiary that did not produce revenue.  In late December, 1999, Bryan and Beans approved the addition of

these lines to the DTOTS database.  ¶ 113.  This practice affected ICG's line count for either or both the fourth quarter of 1999 and the first quarter of 2000.

**Uninstalled lines** were lines that were not yet installed and operating.  During the first two quarters of 2000, Beans instructed ICG staff to add uninstalled lines to the DTOTS database.  ¶ 115.  Beans allegedly ordered that these lines be recognized in the database because they were necessary to meet Wall Street's line count expectations.  This practice significantly affected ICG's reported line count in the fourth quarter of 1999, and the first quarter of 2000.  ¶¶ 115-118.

**Non-existent lines** are, in essence, lines that never were sold or installed, but which were represented in the DTOTS database and reported as revenue producing lines.  To inflate ICG's line count, Beans allegedly instructed ICG's technical consultants in the weeks before the end of fourth quarter 1999 to "create lines," which they did.  ¶¶ 91-93.  ICG thereby reported revenue on lines that had not actually been installed.  ¶ 89.  Beans allegedly directed employees to fabricate line orders during the first and second quarters of 2000 as well.  One week before the end of the first quarter of 2000, Beans held an "all hands" meeting in ICG's provisioning center.  ¶ 119.  Beans stated that ICG was 106,000 lines short of its quarterly objective.  *Id.*  Immediately after this meeting, Beans met with ICG's Provisioning Director and its Vice President of Provisioning.  *Id.*  Thirty minutes after this meeting, employees could hear the ICG wholesale group being told to write orders for 25,000 to 50,000 lines, regardless of whether a purchaser or ISP was involved.  ¶ 120.  These false line orders were added to ICG's official line count for that quarter.  *Id.*  The same scenario unfolded one week before the end of the second quarter of 2000.  ¶ 121.

The plaintiffs allege also that audit reports conducted in March, 2000, revealed that between 120,000 and 160,000 lines were being billed to switch sites which had maximum line capacities of only 84,672 lines.  ¶¶ 122-125.  Bills were generated for these artificial line counts, and revenue was booked for these lines, but actual bills were not sent out for these artificial lines.  ¶ 124.  In response to one such audit report, ICG's Vice President of Finance told an employee that "Bryan has always done this," and that Bryan has been artificially inflating the company's line counts for years.  ¶ 125.

## B.  Reciprocal Compensation Revenue

During the class period ICG allegedly attributed a large share of its reported revenue to reciprocal compensation revenue allegedly owed to ICG by regional Bell operating companies (RBOC) or incumbent local exchange carriers (ILEC).  ¶ 13. Under the scheme created by the Telecommunications Act of 1996, a competitive local exchange carrier (CLEC) like ICG was entitled to a usage fee when an RBOC/ILEC customer made a call over a CLEC's network.  ¶ 138.  For various reasons outlined in the Complaint, it was highly unlikely that ICG actually could collect this revenue. ¶¶ 138-146.  Although ICG represented that it would recognize such revenue if it was "more likely than not" that it would be collected, ICG allegedly recognized such revenue when Bryan and Beans were aware that the collection of such revenue was highly unlikely.  ¶¶ 142-146.

## C.  Network and Customer Service Problems

The plaintiffs allege that important aspects of ICG's network were failing for much of 1999 and 2000.  These problems made ICG unable to provide the services it promised to customers and to accommodate the growth in line count that ICG was

touting to Wall Street.  In addition, these network problems caused great dissatisfaction among ICG's customers.  ¶ 9.

Beginning in the Summer of 1999, certain Cisco routers and software caused ICG's network to crash at 2:00 a.m., every morning.  ¶ 65.  This caused an onslaught of complaints from customers.  *Id.*  This problem persisted through October, 2000. ¶ 68.

During the same time period, ICG faced problems with Lucent switches used in ICG's new network.  ¶ 69.  The first Lucent switches used by ICG were designed for voice data, and not data transmitted by internet service providers.  *Id.*  These switches did not work properly on ICG's network.  *Id.*  Beans was aware of the substantial problems created by the use of these switches.  ¶ 71.  ICG tried other Lucent switches, but found that these switches did not solve the problem.  ¶¶ 72-73.  As a result of ICG's ongoing network failures, ICG's customers registered frequent complaints about ICG with the Public Utilities Commission in 1999.  ¶ 74.

The plaintiffs allege that Bryan and Beans were aware of both the pervasive problems with ICG's network, and pervasive customer dissatisfaction, because Bryan and Beans were made aware of the concerns voiced by ICG employees at an all-day focus group held on August 27, 1999.  ¶ 77.  At the meeting ICG employees expressed concerns about the long time needed to install lines after an order, ¶¶ 80, 81, the lack of customer service, ¶¶ 82, 83, and ICG's obsession with line count at the expense of customer service.  ¶¶ 82 - 83.  A court reporter transcribed everything said at the meeting, and the transcript was bound into a book called "Relationships by Objectives" (RBO).  *Id.*  Keith Abraben, ICG's Senior Director of Employee Relations, presided over the meeting and told the meeting participants that the issues raised at the meeting

would be presented to ICG's management, including Beans.  ¶ 77.  The plaintiffs allege that Bryan received this information as well.  Abraben told the meeting that the boss (presumably Beans) is going to get this, and his boss' boss (presumably Bryan) is going to get this.  ¶ 78.

In the first and second quarters of 2000, many ICG customers were refusing to pay for lines already purchased and installed.  ¶ 134.  Customers also began to cancel hundreds of thousands of lines they had ordered, but which had not yet been installed. *Id.*  Large credits were issued to major customers during this time, but reported revenues were not reduced to reflect these credits.  ¶ 135.   By early Summer of 2000, problems with ICG's network were causing ISPs to route their traffic via other networks, and to not give new business to ICG.  ¶ 132.  Microsoft, Netzero, and other ISPs were threatening to withdraw their business from ICG unless service improved.  Beans flew to Microsoft's headquarters to "patch up" relations.  ¶ 131.  By August, however, Microsoft threatened to terminate its ICG account after service deteriorated further.  *Id.*

Despite these problems ICG continued to offer an optimistic public outlook in 2000.  In a February 29, 2000, press release, ICG stated that it had "installed a record 133,000 net business access lines and Internet service provider (ISP) ports during the fourth quarter, bringing the year-end total to 731,000, more than double the year-end 1998 total." ¶ 151.  Revenues for the year were reported at 479.2 million dollars, a 58 percent increase over the prior year.  *Id.*  The company claimed that its "higher gross operating margin is due to increased volume on ICG's network that greatly improved network efficiency . . . ."  *Id.*  Ever-increasing line installations and revenues were

reflected in the company's press releases and Form 10-Qs for the first and second

quarters of 2000 as well.  ¶¶ 157- 165.

### D.  Disclosure

The balloon finally began to deflate on August 10, 2000, when ICG announced

that the company's expectations for EBIDTA would be 45 million dollars less than

expected in 2000 and 100 million dollars less than expected in 2001.  The company's

stock immediately dropped 53.95 percent to slightly more than $6.50 a share.  ¶¶ 166 -

167.   Less than two weeks later, Bryan resigned.  ¶ 168.  The network problems and

customer service issues were finally made manifest on September 18, 2000, when ICG

"announced a revised business plan in order to conserve cash resources, address

serious customer service issues that have arisen and for other reasons. . . .  The new

plan anticipates that for the remainder of 2000 and in 2001 the Company will

experience reduced capital and corporate expenditures, slower expansion, significantly

lower line installations, lower overhead costs and significantly reduced revenues and

EBITDA [*sic*] [earnings before interest, depreciation, taxes, and amortization]. . . ."

¶ 169.  The company's stock quickly bottomed out at $1.66, and various members of

the Board of Directors, including its new Chairman, resigned.  ¶ 171.  ICG filed for

bankruptcy on November 14, 2000, and NASDAQ de-listed its stock four days later.

¶ 172.

### V.  SECURITIES FRAUD - § 10(b)

Section 10(b) of the Securities and Exchange Act provides:

> It shall be unlawful for any person, directly or indirectly, by
> the use of any means or instrumentality of interstate
> commerce or of the mails, or any facility of any national
> securities exchange –

. . . .

>    (b) To use or employ, in connection with the purchase or
>    sale of any security registered on a national securities
>    exchange . . . any manipulative or deceptive device or
>    contrivance in contravention of such rules and regulations
>    as the Commission may prescribe as necessary or
>    appropriate in the public interest or for the protection of
>    investors.

15 U.S.C. § 78j(b) (West Supp. 2004).  Rule 10b-5, promulgated under authority of this

section, renders it a violation of section 10(b) "[t]o make any untrue statement of a

material fact or to omit to state a material fact necessary in order to make the statement

made, in the light of the circumstances under which they were made, not misleading."

17 C.F.R. § 240.10(b)(5).  To state a cause of action under this section, plaintiffs must

allege: "'(1) a misleading statement or omission of a material fact; (2) made in

connection with the purchase or sale of securities; (3) with intent to defraud or

recklessness; (4) reliance; and (5) damages.'" *City of Philadelphia v. Fleming*

*Companies, Inc.*, 264 F.3d 1245, 1257-58 (10th Cir. 2001) (quoting *Grossman v.*

*Novell, Inc.*, 120 F.3d 1112, 1118 (10th Cir. 1997)).

The specificity with which these allegations must be set forth in the complaint is

governed by the demanding standards of the PSLRA.  As to any allegedly untrue or

misleading statement or omission, "the complaint shall specify each statement alleged

to have been misleading, the reason or reasons why the statement is misleading, and,

if an allegation regarding the statement or omission is made on information and belief,

the complaint shall state with particularity all facts on which that belief is formed."  15

U.S.C. § 78u-4(b)(1).  The complaint also must "state with particularity facts giving rise

to a strong inference that the defendant acted with the required state of mind."  *Id.*,

§ 78u-4(b)(2). "Despite these strictures, however, a pleading setting forth a section 10(b) claim need not be precise to the point of pedantry; although it must set forth the supporting facts with particularity, it need not elaborate upon every jot and tittle of evidentiary detail." *In re Credit Suisse First Boston Corp.*, 431 F.3d 36, 46 (1st Cir. 2005) (citation omitted).

The state of mind required to state a cause of action under section 10(b) and Rule 10b-5 is scienter, that is, an "intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976). Scienter can be proven by showing either knowing or intentional misconduct or recklessness, that is, "'conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" *Fleming Companies*, 264 F.3d at 1258 (quoting *Anixter v. Home-Stake Production Co.*, 77 F.3d 1215, 1232 (10th Cir. 1996)). The court must examine the totality of the pleadings to determine whether they create the requisite "strong inference" of scienter. *Id*. at 1261-62.

A strong inference of scienter is "a conclusion logically based upon particular facts that would convince a reasonable person that the defendant knew a statement was false or misleading." *Adams v. Kinder Morgan, Inc.*, 340 F.3d 1083, 1105 (10th Cir. 2003). A variety of factors may be relevant in considering the plaintiff's scienter allegations. For example, an allegation that the defendants failed to follow Generally Accepted Accounting Principles, by itself, is insufficient to support a strong inference of scienter. *Adams*, 340 F.3d at 1105 -06. However, allegations of pervasive and long-standing accounting machinations, or large scale accounting machinations, may

support a strong inference of scienter under the PSLRA. *Id.; In re MicroStrategy, Inc. Securities Litigation*, 115 F.Supp.2d 620, 635 (E.D.Va. 2000) (number, size, timing, nature, frequency, and context of accounting manipulations, combined with other circumstances, can provide support for strong inference of scienter).

A defendant's knowledge of the true material facts also can support a strong inference of scienter.  A manipulation or false statement presents a danger of misleading buyers or sellers only when the manipulation or statement concerns material information.  A scheme or misrepresentation is fraudulent only if the defendant was aware that the falsehood he sought to present would be viewed by the reasonable investor as having significantly altered the total mix of information made available. *Garcia v. Cordova*, 930 F.2d 826, 829 (10th Cir. 1991) (quotation omitted).  In the context of a claim based on non-disclosure of material facts, a plaintiff must show that the defendant 1) knew of the material fact; and 2) knew that failure to reveal the fact likely would mislead investors. *Fleming*, 264 F.3d at 1261.

The defendants argue that the plaintiffs' allegations do not state a claim on which relief can be granted under § 10(b).  They make five primary arguments:

A) the plaintiffs' allegations do not demonstrate a causal connection between the alleged material misrepresentations and the plaintiffs' alleged loss;

B)  the plaintiffs have not adequately pled scienter via motive and opportunity pleading;

C)  the plaintiffs have not adequately pled Bryan or Beans' knowledge of the alleged network and customer service problems;

D)  the allegations concerning reciprocal compensation revenue are deficient because the plaintiffs have not alleged that Bryan or Beans did not reasonably believe that this revenue could be collected; and

E)  the plaintiffs' allegations concerning ICG's inflated line count are inadequate because the are not sufficiently particular.

Each of these arguments is addressed below.

### A.  Loss Causation

The defendants argue that the Complaint's line count and reciprocal compensation allegations are not sufficient to demonstrate loss causation.  To plead this element of their claims, the plaintiffs must allege "that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages."  15 U.S.C. § 78u-4(b)(4).  Citing the recent Supreme Court case of *Dura Pharmaceuticals, Inc. v Broudo*, the defendants argue that the plaintiffs must allege that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security. ___ U.S. ___, ___, 125 S.Ct. 1627, 1631 (2005).

In *Dura*, the Court held that an allegation that a misrepresentation caused the price of a security to rise, by itself, is not sufficient to allege that the misrepresentation caused a loss to the purchaser of such a security.  *Id*. at ___, 125 S.Ct. at 1634.  "(A)rtificially inflated purchase price is not itself a relevant economic loss."  *Id*.  The complaint's "failure to claim that Dura's share price fell significantly after the truth became known suggests that the plaintiffs considered the allegation of purchase price inflation alone sufficient," but the *Dura* court concluded that such an allegation is not sufficient to support a claim of securities fraud.  *Id*.

In their first motion to dismiss, the defendants argued that the plaintiffs had not alleged that the precipitous declines in ICG's stock price in August and September, 2000, were in any way tied to announcements concerning ICG's line count or

18

recognition of reciprocal compensation revenue. *Defendants' brief in support of motion to dismiss* [#66], filed May 14, 2002, p. 53.  In my August 25, 2004, order I concluded that the plaintiffs adequately had pled loss causation.  I applied essentially the standard re-stated in **Dura**.

> (T)his case presents a "typical loss causation situation, [in which] the plaintiff alleges inflation of the stock price due to defendants' painting the company in a favorable, albeit untruthful, light, disclosure of the true state of the company at some later point, and an immediate decline in the stock price as a result of the marked reaction to the belated disclosure."

*August 25, 2004, order*, p. 22.  I concluded that the loss causation requirement does not read at the level of specificity suggested by the defendants.

In the present Complaint, the plaintiffs make essentially the same allegations of loss causation as they made in the previous complaint.  The plaintiffs allege that ICG announced substantially reduced earnings expectations on August 10, 2000, causing ICG's stock to lose 53.95 percent of its value in one day.  On September 18, 2000, ICG announced a revised business plan intended to address "serious customer service issues," "network outages, equipment failures and technical difficulties."  ¶ 169.  This announcement disclosed for the first time that certain principal customers had reduced their commitments to ICG, and had expressed an intent to terminate their relationship with ICG if the technical issues were not resolved.

These announcements of substantially reduced earnings expectations, and other serious problems with ICG's business, reasonably can be seen as revelation of the negative truth about ICG's business.  ICG's stock price dropped precipitously after these truths were revealed.  These allegations are sufficient to plead loss causation under the applicable standard.  The law does not require the plaintiffs to allege that

ICG disclosed every fine detail of the alleged manipulation of ICG's revenue to establish that those manipulations caused the plaintiffs' losses.

### B. Scienter - Motive & Opportunity

The defendants argue that the plaintiffs allegations concerning the defendants' motive and opportunity to commit fraud are insufficient to support a strong inference of scienter.  As the plaintiffs note, they need not plead motive and opportunity in order to establish scienter.  *See, e.g., City of Philadelphia v. Fleming Cos., Inc.*, 264 F.3d 1245, 1261-1262 (10th Cir. 2001).  Rather, motive and opportunity are only one factor that may support a strong inference of scienter.

In my August 25, 2004, order, I concluded that the plaintiffs' allegation that the defendants committed the alleged fraud in an effort to secure capital and financing was not sufficient to support an inference of scienter based on motive and opportunity. *August 25, 2004, order*, p. 19.  The plaintiffs' motive allegations have not been altered or enhanced significantly in the present Complaint.   In their response to the current motion to dismiss, the plaintiffs appear to indicate that they do not intend to rely on motive and opportunity allegations to support a strong inference of scienter. *Response*, p. 24, n.23.  I do not read the plaintiffs' Complaint as relying on motive and opportunity allegations to support a strong inference of scienter.

### C.  Knowledge of Continuing Network and Customer Service Problems

The defendants argue that the plaintiffs have not alleged sufficiently that the defendants were aware of the alleged chronic problems with ICG's network and customer service.  Under the circumstances described in the Complaint, allegations which indicate that the defendants knew of these problems are necessary to support a

strong inference of scienter concerning the defendants alleged concealment of material facts and misrepresentations concerning these problems.

In my August 25, 2004, order, I dismissed the plaintiffs claims concerning concealment of ICG's network and customer service problems because the plaintiffs had not alleged adequately that either Bryan or Beans knew of these problems, and knew that the problems with ICG's network were not fixable.  *August 25, 2004, order*, p. 20.  Absent such knowledge, I cannot infer that Bryan and Beans acted with scienter in concealing such facts or in misrepresenting the facts to be otherwise.  ***Fleming***, 264 F.3d at 1263-64.  Further, if the defendants knew of these problems, but believed they could be fixed in a reasonable time, they are not liable for securities fraud for failing to reveal the problems publically.  *August 25, 2004, order*, p. 20.

The plaintiffs have added a variety of allegations concerning Bryan and Beans' knowledge of these problems in their present Complaint.  The plaintiffs allege that Bryan and Beans became aware of these problems when the report of comments made by ICG employees at the August 27, 1999,  focus group meeting was given to Bryan and Beans.  ¶¶ 77-83.  In their reply, the defendants claim, without citation, that the plaintiffs now concede that Bryan and Beans never received the full transcript of this meeting, sometimes called the RBO report.  The defendants argue further that there is no allegation that Bryan and Beans received a list of questions extracted from the transcript, rather than the full transcript.  The Complaint does indicate that Bryan and Beans received the full transcript, or RBO.  ¶ 77.  However, the Complaint also indicates that the extracted questions would be delivered to ICG management, including Beans.  *Id.*

Although a bit unclear on the precise form in which the information from this meeting was delivered to Beans and Bryan, I conclude that the plaintiffs sufficiently have alleged that the concerns stated by ICG employees at this meeting were communicated to Bryan and Beans.  The fact that the precise form in which this information was delivered is a bit unclear does not mean that these allegations must be disregarded.

However, the plaintiffs do not allege that Bryan was aware that the kind of problems described in the July, 1999, meeting continued through the fourth quarter of 1999, and the first and second quarters of 2000.  The plaintiffs argue that "the fact that many of ICG's largest customers were cancelling their contracts as early as October, 1999, should have made the Defendants aware of the Company's network and attendant customer problems." *Response*, p. 8.  The plaintiffs have not alleged that Bryan was aware of the cancellation of large customer contracts in the Fall of 1999, or the reasons for those cancellations.  More important, the plaintiffs have not alleged that Bryan was aware that network problems and customer service problems were chronic and continuing throughout the class period.  One might assume that Bryan, as a high official of ICG, must have been aware of these serious problems.  Such an assumption, however, cannot support a strong inference of scienter under the PSLRA.  ***Fleming***, 264 F.3d at 1263-64.

On the other hand, I conclude that the plaintiffs have alleged sufficiently that Beans was aware of the ongoing problems with ICG's network and its related customer service problems.  Again, the plaintiffs have alleged sufficiently that Beans was aware of the information in the focus group meeting report.  Further, they allege that Beans

22

was told that the troublesome Lucent switches could not be fixed, but he ordered that the switches be used anyway.  ¶ 71.  Beans continuing awareness is indicated also by the allegation that in the first and second quarters of 2000, customers were cancelling lines and large credits had to be issued to angry customers.  ¶¶ 134 - 135.  In the face of this information, Beans allegedly ordered that the cancelled lines not be booked until a later date.  ¶ 135.  By early Summer of 2000, problems with ICG's network were causing ISPs to route their traffic via other networks, and to not give new business to ICG.  ¶ 132.  Microsoft, Netzero, and other ISPs were threatening to withdraw their business from ICG unless service improved.  Beans continuing awareness of these circumstances is indicated by the allegation that he flew to Microsoft's headquarters to "patch up" relations during this time. ¶ 131.  These allegations are sufficient to indicate that Beans had continuing knowledge of ICG's network and customer service problems during the relevant time period.

### D.  Reciprocal Compensation Revenue

In my August 25, 2004, order, I denied the defendants' motion to dismiss concerning the reporting of reciprocal compensation revenue in the fourth quarter of 1999.  *August 25, 2004, order*, pp. 21-22.  However, I concluded also that the plaintiffs' claim that ICG did not maintain adequate reserves concerning reciprocal compensation revenue did not support a claim of securities fraud because the plaintiffs did not indicate how this practice was intended to mislead or defraud investors.  *Id.*, p. 15.

The defendants argue now that the plaintiffs' claim based on improper recognition of reciprocal compensation revenue should be dismissed because the plaintiffs have not alleged facts showing that either Beans or Bryan did not reasonably

believe that ICG would collect the reciprocal compensation revenue it recorded. *Motion to dismiss*, pp. 21-22. The plaintiffs allege that from 1998 to 2000, Bryan and Beans received a series of internal company memos authored by ICG's Executive Vice President of Governmental Affairs. ¶ 144. She was in charge of the many regulatory issues regarding reciprocal compensation revenue. *Id.* In these memos she documented her opinion that ICG should not be recognizing this revenue because it was extremely unlikely that the revenue ever would be collected. *Id.* ICG represented that it would recognize such revenue when it was more likely than not that it would be collected. *Id.* The plaintiffs allege that Bryan and Beans recognized this revenue in the fourth quarter of 1999, and the first two quarters of 2000, knowing that it was highly unlikely that the revenue ever would be collected. ¶¶ 137 - 146. The plaintiffs sufficiently have alleged facts indicating that Bryan and Beans did not reasonably believe that it was more likely than not that ICG would collect the recognized reciprocal compensation revenue.

### E.  Line Count Allegations

The plaintiffs allege that Beans and Bryan were aware that ICG's line counts were inflated artificially, and that Beans and Bryan took a variety of steps to ensure that this artificial inflation continued. In my August 25, 2005, order, I concluded that the plaintiffs' allegations did not support a claim based on inflation of ICG's line count as to Bryan. *August 25, 2004, order*, pp. 17 - 18. In essence, I concluded that the plaintiffs' allegations did not indicate that Bryan was aware of the falsity of ICG's public line count representations because there was little indication that Bryan was aware of contrary information. *Id.*

On the other hand, I concluded in the August 25, 2004, order that the plaintiffs

sufficiently had alleged that Beans had artificially inflated ICG's line count when he

ordered ICG technicians to create lines.  *Id.* p. 17.  I concluded that the plaintiffs

sufficiently had alleged that Beans ordered the creation of lines in the fourth quarter of

1999, and that this order had been carried out by ICG employees.  *Id.*  I concluded also

that the plaintiffs had not alleged that such orders from Beans in the first two quarters

of 2000 actually were carried out.

The plaintiffs' line count allegations are substantially enhanced in the present

Complaint.  Again, in mid-1999, Beans began to conduct weekly meetings to monitor

ICG's progress in meeting Wall Street's expectations.  ¶¶ 33, 49.  In addition, Bryan

convened larger monthly meetings that lasted two hours or more, with at least the first

45 minutes devoted exclusively to ICG's line count.  ¶ 50.  Beans led these monthly

meetings.  *Id.*  Bryan actively participated in the decision making process discussed at

these meetings, and signed off on all line count reporting practices.  *Id.*  Line count was

a key issue at these meetings because by the fourth quarter of 1999, the technical

problems with ICG's network threatened the lines that were already sold to the ISPs

and threatened ICG's ability to legitimately meet Wall street's expectations.  As a

result, these weekly executive meetings became focused almost exclusively on ways

for the Company to artificially inflate its line count to meet or exceed Wall Street's line

count expectations.  ¶ 85.  If Bryan and Beans knowingly caused a significant artificial

inflation of ICG's line count, and, thus, caused ICG to report a significantly higher

number of revenue producing lines than actually existed, then Bryan and Beans could

be seen as knowingly having made misleading statements or omissions of a material fact concerning IGC's line count and revenue.

The defendants argue that the Complaint's allegations that Bryan and Beans were aware of the artificial inflation of line counts through the alleged weekly and monthly meetings are inadequate because they are based exclusively on accounts from ICG employees who are not alleged to have attended the meetings.  The plaintiffs do rely on reports of ICG employees who are not alleged to have attended these meetings, but they also rely on reports from Vincent Dibiase, who is alleged to have been a regular participant at Beans' weekly meetings.  ¶ 49.  Although not crystal clear on this point, the Complaint can be read to indicate also that Dibiase attended Bryan's monthly meetings.  ¶ 50.  The allegations based on Dibiase's information, combined with the other factual allegations in the Complaint, are sufficient to allege that Bryan and Beans were aware of the artificial line count inflation measures that allegedly were discussed at these meetings.

The defendants argue that the plaintiffs have not alleged sufficiently that the artificial inflation of ICG's line count caused an artificial inflation of ICG's reported revenue.  They argue that the plaintiffs' allegations concerning the connection between line count and revenue are conclusory, and are based on reports of ICG employees who did not have responsibility for accounting determinations.  The plaintiffs have alleged that a substantial portion of ICG's revenue was driven by income derived from the sale of lines.  The plaintiffs have described sufficiently the direct link between the sale of lines and ICG's revenue.  Under the circumstances described in the Complaint, an artificial inflation of line count necessarily indicates an artificial inflation of revenue.

The reports of ICG employees described in the Complaint are sufficient to allege that ICG's artificial inflation of its line count caused an artificial inflation of ICG's reported revenue.

According to the defendants, the plaintiffs have not alleged sufficiently that Beans ordered ICG employees to create lines as part of the fraud.  The defendants note an allegation that Beans told employees to "do whatever you have to do" to sell enough lines to meet Wall Street's expectations.  They note that there is "nothing untoward in instructing employees to do their jobs." *Motion to dismiss*, p. 25.  This is true, but the Complaint provides greater detail than the defendants acknowledge.  For example, Beans is alleged to have told a specific ICG employee: "You will create lines. You have three days."  ¶ 92.  Further, the allegations describing the meetings Beans held at the end of the first and second quarters of 2000, in which the gap between reported lines and quarterly goals was discussed, also provide sufficiently specific allegations indicating that Beans ordered the creation of lines.  ¶¶ 119 - 121.  Shortly after these meetings, ICG employees were directed to write fictitious orders for tens of thousands of lines.  *Id.*  These allegations are sufficient to demonstrate both Beans' knowledge of the artificial inflation of line count and his active participation in artificially inflating ICG's line count.

The defendants assert that the plaintiffs' allegations do not tie Bryan and Beans to each of the other particular techniques allegedly used at ICG to artificially inflate its line count.  After outlining Bryan and Beans general goal of artificially inflating ICG's line count, ¶ 85, the plaintiffs allege, based on the report of Vince Dibiase, that Bryan and Beans directed ICG's executive team to artificially boost ICG's line count by selling

discounted lines, delaying billing, offering free lines, pushing line cancellations into future quarters, and adding various types of non-revenue producing lines to ICG's line count. ¶ 97.  Dibiase was a regular participant in the meetings at which artificial inflation of ICG's line count allegedly was a routine topic of discussion.  ¶¶ 49 - 50. These allegations concerning Beans and Bryan's directives to inflate ICG's line counts by the means listed above, combined with the allegations describing how these means were used by ICG personnel to inflate ICG's line count, are sufficient to tie Bryan and Beans to the use of these techniques.

The defendants argue further that the plaintiffs' allegations concerning each of the particular techniques allegedly used to artificially inflate ICG's line count are not sufficiently detailed.  The defendants claim that the plaintiffs must specify which employees used these techniques, when they used them, how many lines were added to ICG's line counts as a result of each technique's use, and other details.  *Motion to Dismiss*, p. 27.  The plaintiffs describe with sufficient detail the specific line count inflation techniques ICG allegedly used.  For some of these techniques, they allege also that the technique resulted in artificial inflation of the line count by certain amounts.  e.g. ¶¶ 101, 105, 107, 115, 118, 128, 156, 165.  The plaintiffs allege also that the artificial inflation of ICG's line count caused a substantial, material, and artificial inflation of ICG's stated revenue in the fourth quarter of 1999, and the first two quarters of 2000.  These allegations are sufficiently detailed.  Again, a Complaint alleging a violation of § 10(b) need not elaborate on "every jot and tittle of evidentiary detail."  ***In re Credit Suisse First Boston Corp.***, 431 F.3d 36, 46 (1st Cir. 2005) (citation omitted).

28

## F.  Conclusion

I find that the plaintiffs have not alleged that Bryan was aware that network problems and customer service problems were chronic and continuing throughout the class period, nor have they alleged that Bryan knew that those problems could not be fixed.  Absent such allegations, I cannot conclude that Bryan knowingly failed to disclose such material information, or that he knowingly misrepresented the state of ICG's business with respect to these issues.  Absent some indication that Bryan had such knowledge, I cannot conclude that the Complaint supports a strong inference of scienter concerning Bryan's alleged statements and concealment on these issues.

With regard to the other aspects of the plaintiffs' § 10(b) claim, I conclude that the Complaint states with sufficient particularity facts giving rise to a strong inference that the defendants acted with scienter in concealing facts and making misrepresentations, as alleged in the Complaint.  I arrive at this conclusion after considering all reasonable inferences that can be drawn from the facts alleged, including those inferences that are unfavorable to the plaintiffs.

## VI.  SECTION 20(a) CLAIM - CONTROLLING PERSON LIABILITY

Plaintiffs have sued defendants also under section 20(a) of the Exchange Act, which provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or any rule or regulations thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, . . . .

15 U.S.C. § 78t(a).  Liability under this provision is premised on a primary violation of

the securities laws.  *See Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1107-08 (10th Cir. 2003).

For the reasons outlined above, I will dismiss the plaintiffs' § 10(b) claim against Bryan to the extent that claim is based on Bryan's alleged failure to disclose customer complaints and network service problems.  On the other hand, the § 10(b) claim against Beans based on his alleged failure to disclose customer complaints and network service problems is pled adequately.  Absent its bankruptcy discharge, ICG would be liable also on this aspect of the plaintiffs' § 10(b) claim, as well as for the other § 10(b) violations alleged in the Complaint.

The plaintiffs allege that Bryan and Beans were controlling persons as to ICG. As controlling persons of ICG, Bryan and Beans are liable under § 20(a) for any § 10(b) violations committed by ICG.  Because the plaintiffs adequately have pled  § 10(b) violations as to Bryan, Beans, and ICG, they adequately have pled a § 20(a) claim against Bryan and Beans based on these violations

## VII.  ORDERS

**THEREFORE, IT IS ORDERED** as follows:

1.  That the **Defendants' Motion to Dismiss Plaintiffs' Second Consolidated and Amended Complaint** [#160], filed August 1, 2005, is **GRANTED** with respect to the plaintiffs' § 10(b) claims against J. Shelby Bryan related to the failure to disclose customer complaints and network service problems; and

2.  That the **Defendants' Motion to Dismiss Plaintiffs' Second Consolidated and Amended Complaint** [#160], filed August 1, 2005, otherwise is **DENIED**.

Dated February 7, 2005, at Denver, Colorado.

**BY THE COURT:**

**s/ Robert E. Blackburn**
**Robert E. Blackburn**
**United States District Judge**